UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| TRENT MARION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF CORYDON, INDIANA and | ) | |
| JOHN DOE #1, Unknown Police Officers | ) | |
| of the City of Corydon, THE COUNTY OF | ) | |
| HARRISON, INDIANA and JOHN DOE #2, | ) | |
| Unknown Police Officers of the County | ) | |
| of Harrison, ROY WISEMAN, BRUCE | ) | CASE NO. 4:07-cv-0003-DFH-WGH |
| LAHUE, KEVIN TAYLOR, JAMES | ) | |
| SADLER, TODD STINSON, THE CITY OF | ) | |
| LOUISVILLE, KENTUCKY and JOHN | ) | |
| DOE #3, Unknown Police Officers of the | ) | |
| Louisville Metropolitan Police | ) | |
| Department, THE CITY OF NEW ALBANY, | ) | |
| INDIANA and JOHN DOE #4, | ) | |
| Unknown Police Officers of the City of | ) | |
| New Albany, JOHN DOE #5, Unknown | ) | |
| Police Officers of the Indiana State Police, | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON PENDING SUMMARY JUDGMENT MOTIONS
AND RELATED MATTERS

On January 20, 2006, plaintiff Trent Marion led police officers from two

different states on a high speed chase. It started on the city streets of Louisville,

Kentucky. It ended about twenty miles away, in the median of Interstate 64 near

Corydon, Indiana. In the course of arresting Marion, police officers shot Marion

several times and wounded him seriously. Marion filed this action under

42 U.S.C. § 1983 against the City of Louisville, the City of Corydon, the City of New Albany, the County of Harrison, Indiana, and several officers from those jurisdictions and from the Indiana State Police. Marion claims the officers violated his Fourth Amendment rights by using excessive force against him. He also claims that the officers acted pursuant to unconstitutional customs and policies of the local government defendants.

All defendants, except the City of Louisville and its unknown officers, have filed motions for summary judgment. The defendants have supported their motions with affidavits and with video recordings of the events leading up to the shooting. The defense evidence paints a clear factual picture of what occurred that day. Plaintiff has offered no counter-affidavit, even from himself. He has not pointed to any evidence that would bring into question the affidavits and video evidence that support the summary judgment motions. The material facts presented by the defendants stand uncontroverted, and all of the motions are granted. Plaintiff has requested oral argument on the motions, but without affidavit testimony or other evidence from plaintiff to refute the defense testimony and what can clearly be seen in the video recordings, the court sees no need for oral arguments. The arguments of counsel could not substitute for evidence. Without contradictory evidence, there are no triable issues of fact.

*Standard of Review*

-2-

Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party.   See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court's ruling on a motion for summary judgment is akin to that on a motion for a directed verdict. The essential question for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  When ruling on the motion, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* at 255.  However, the Supreme Court recently instructed that when a court analyzes a summary judgment motion, the court can and should accept as true the facts depicted by unchallenged video recordings where a reasonable jury could not reject that evidence. *Scott v. Harris*, 550 U.S. —, —, 127 S. Ct. 1769, 1776 (2007) (holding that officer's summary judgment motion should have been granted on the merits; and relying in part on videotape of high speed chase that contradicted plaintiff's evidence about events that led up to officer's decision to bump suspect's vehicle, causing accident that paralyzed suspect).[1]

---

[1]The court does not mean to suggest that video evidence always, or ever, stands beyond any possible contradiction, impeachment, or explanation.  Any video recording reflects a particular point of view and has its limitations.  These basic elements of hermeneutic theory, however, do not undermine the force of the
(continued...)

If the non-moving party bears the burden of proof on an issue at trial, that party must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999).  The moving parties need not positively disprove the opponent's case; rather, they may prevail by establishing the lack of evidentiary support for that case.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

---

[1](...continued)
uncontradicted video evidence in this case.  As in any case on summary judgment, the court must consider the evidence that would be presented to the jury and decide whether a jury could reasonably disagree in its evaluation of the material facts.

*Undisputed Facts*[2]

On January 20, 2006, Trent Marion was leaving a Kroger grocery store in Louisville, Kentucky.  Police officers approached him.  They had been called to the scene by an off-duty officer working security at the store.  The off-duty officer suspected that Marion had not paid for certain merchandise.  When approached, Marion admitted that he had hidden grocery items in and around a baby in an infant seat that Marion had placed in the grocery cart he was pushing.  As Marion was being escorted to the store's loss prevention office, he grabbed the infant seat from the grocery cart, pushed one officer aside, and bolted out of the store.

The Louisville police officers and store personnel followed Marion outside to the parking lot, where Marion ran to a red 1993 Ford Explorer.  After tossing the baby seat, with the baby in it, into the front seat area on the passenger side, Marion attempted to enter and start the vehicle.  A scuffle ensued between Marion

---

[2]The facts presented here are taken from the affidavits of law enforcement officers and other witnesses to the police chase, as well as from the videotape evidence of events taking place at the Louisville grocery store and during the extended car chase.  The video recordings are appendices to Docket No. 99. Appendix C is the video recording from Louisville Metro Police Officer Alvey's car. It shows the early stages of the chase beginning in Louisville and continuing at high speeds with reckless maneuvers into Indiana.  Appendix E is the video recording from New Albany Police Captain Rick Denny's car.  He took the lead chase role in Indiana, and the video shows numerous dangerous and evasive maneuvers, including attempts to avoid the rolling roadblock.  Appendix K is the video recording from Corydon Police Officer Todd Stinson's car.  It includes audio (with audible gunshots) and shows Marion's vehicle at the end of the chase continuing to accelerate forward and backward in the highway median in a continued effort to flee before and as shots were fired.  Appendix M is the video recording from Corydon Police Officer James Sadler's car, which also shows the rolling roadblock and includes the audio of the gunshots at the end.

and the four Louisville police officers on the scene.  During the scuffle, a Kroger employee managed to grab the baby seat and removed the baby from the vehicle. (In light of the chase that ensued, this was one of the bright spots of the whole story.)

Louisville Police Officer Michael Alvey attempted to use his taser to subdue Marion, but Marion was able to reach out and twist the taser cartridge so that it would not fire.  Aggressively hitting, kicking, and jabbing the officers with his keys, Marion managed to start the Explorer.  He backed out of the parking space with a door open, collided with another vehicle, and nearly hit an officer.  As Marion fled the parking lot, Officer Alvey pursued immediately in his police car.

Marion led Officer Alvey and other Louisville police units on a high speed chase through the streets of Louisville to Interstate 64.[3]  He drove his vehicle on I-64 across the Sherman Minton Bridge over the Ohio River and into Indiana.  As Marion entered Indiana, Louisville dispatchers alerted law enforcement agencies in Indiana to the chase.

---

[3]The Alvey video, Appendix C, shows vividly Marion's reckless driving during the high speed chase.  Marion nearly hit an ambulance at 16:52:25; squeezed past slower traffic on a one-lane ramp at 16:53:54; ran a stop sign at 16:54:27; violently side-swiped a truck at high speed, throwing debris, at 16:55:53; and forced another car off the road at 16:56:35.  Marion's reckless driving endangered more than a hundred vehicles and their drivers and passengers in the course of the ten minutes or so depicted on this video recording.

New Albany Police Captain Rick Denny received a radio dispatch alert from his department. The alert told him and other New Albany officers that Louisville police were pursuing an armed robbery suspect westbound on I-64.[4] Denny was already on I-64. He began monitoring the Louisville police radio frequency on his scanner. He pulled into a turn-around area in the median near mile marker 120. Almost immediately he observed Marion in his Ford Explorer traveling in excess of 80 miles per hour, traveling west and followed by several Louisville police cars with emergency lights and sirens activated. Captain Denny joined the chase. Because he was the first local Indiana officer to join, he eventually took over the lead car position in the pursuit. The Louisville officers dropped back behind him. Other officers from Corydon and Harrison County also joined in the pursuit.

The video taken with a camera mounted on the dashboard of Captain Denny's police cruiser shows Marion's reckless driving at high speed, with no regard for his own or others' safety. See Dkt. No. 99, App. E. As the miles ticked by, other law enforcement officers joined the chase. Marion's vehicle then started to emit smoke, making it more difficult for the officers trailing him to see what Marion was doing inside the vehicle.

---

[4]Whether Marion was actually armed is not material here. The undisputed facts show that the pursuing officers were informed by a reliable source, Louisville police dispatch, that the suspect was armed. Throughout the chase, they never had reason to doubt that information.

At approximately mile marker 113, a Harrison County Sheriff's deputy in the highway median deployed "stop sticks" in an effort to deflate the tires on Marion's Explorer.  Marion swerved at high speed to try to avoid them.  See App. E at 12:08.  The stop sticks damaged and deflated three of the tires, but Marion continued to drive.  He slowed from approximately 80 miles per hour to about 40 miles per hour and weaved from one side of the highway to the other, eventually returning to the left lane.  Debris from the shredding tires and from the Explorer itself began falling in the path of the pursuing police units.  Marion did not stop, but led the parade of vehicles at about half his former speed.  Marion's vehicle continued to smoke.  Different police cars pulled near or along side Marion to observe him and, in at least one instance, to signal him to pull over.  Marion began slumping down in the seat, making it harder for the officers to observe him. The police maneuvered to block Marion from taking any exit he passed.

As the pursuit approached mile marker 105 and the Corydon exit, another attempt was made to deflate the one rear tire that had survived the first set of stop sticks.  Several law enforcement vehicles were parked in the median with officers outside their cars, weapons drawn and stop sticks deployed.  From the audio recording that is part of the video taken from the vehicle of Corydon Police Officer Gary Todd Stinson, one can hear Officer Stinson and another officer in the median discussing their understanding that whoever was being pursued was armed.  App. K at 16:13:20.  Officer James Sadler, also with the Corydon Police, moved his vehicle further down the highway where he thought Marion's vehicle might end up

if the stop sticks were effective.  As Marion approached the stop sticks, he swerved and drove toward several of the officers in the median area and then back into the left hand lane.  See App. E at 12:12:11.  As Marion continued past Officer Sadler's location, Sadler fired his rifle at the engine compartment of the Explorer in an effort to further disable the vehicle, though without visible success.

Officers Sadler and Stinson and others who had parked in the median near the 105 mile marker joined the chase.  At that time, the Louisville police officers pulled completely out of the chase and headed back east to Kentucky.  Captain Denny was still at the front of the pack of law enforcement vehicles following Marion.  Captain Denny asked over the radio if others thought they might be able to help him execute a rolling roadblock on Marion.  Officer Sadler moved in front of Marion's Explorer, now traveling about 25 miles per hour.  Captain Denny remained to the rear and Captain Brad Shepard of the Harrison County Sheriff's Department pulled along side Marion.

For a minute or so, Marion attempted numerous dangerous maneuvers to avoid the rolling roadblock.  See App. E at 12:15:00 to 12:16:00.  He attempted to pass between the police vehicles and swung his Explorer toward Captain Shepard and then back toward Captain Denny, making some contact.  Eventually, he tried to pull around Officer Sadler on the shoulder to Sadler's left.  Sadler stuck his rifle out the driver's window of his vehicle and fired four more shots at Marion's vehicle in a further effort to disable it.  Marion slowed and then suddenly

turned hard to the left into the median toward the eastbound lanes of the interstate, where traffic was slowing or stopped.  By that time there were at least eight or nine law enforcement vehicles in the chase.

The highway median near mile marker 103 was wet and muddy.  Marion's Explorer slowed to nearly a complete stop as he tried to cross.  In the audio record from Officer Stinson's camera, Stinson announced that shots had been fired as he brought his vehicle to a stop on the side of the highway and exited to join other officers who had stopped and were moving on foot to surround the Explorer.  See App. K at 16:20:50 (announcement of shots fired as Marion's vehicle continues to move).  Just as the muddy median and initial shots seemed to be bringing Marion's vehicle to a halt, he put the Explorer into reverse and revved the engine, causing the tires (or what was left of them) to spray mud all about, and the Explorer moved back several feet.  This maneuver scattered the officers who were approaching the Explorer from the rear.

Officer Kevin Taylor, a Harrison County Sheriff's Deputy, was behind the Explorer.  He testified that he and other officers yelled for Marion to stop.  When Marion did not, he fired six rounds at the Explorer as it backed toward him.  As more officers were approaching and demanding that Marion stop and raise his hands, Marion shifted back into a forward gear and continued revving the engine to move forward.  Lieutenant Roy Wiseman of the Harrison County Sheriff's Department was directly in front of the Explorer.  He testified that he and other

officers began firing at it when it moved toward them and toward the eastbound lanes of the interstate.   From the audio and video records made from police vehicles, it is clear that numerous weapons were being fired over a period of about 30 seconds until the engine of Marion's vehicle stopped revving.   See App. K from 16:20:50 to 16:21:20.

All affidavits from officers who fired their weapons when Marion was in the median testified that they did so in fear of lethal danger to themselves or to other officers.   All testified that at no point did they see any sign that Marion was trying to surrender or was stopping his attempts to flee.   All of the police officers and civilians who testified in affidavits indicated that it appeared that Marion intended to drive his vehicle through the median and into the eastbound lanes of the highway, which would have endangered the public traveling or stopped in those lanes.   That testimony is consistent with the video evidence, and there is no contrary evidence from plaintiff.[5]

---

[5]In the complaint, plaintiff alleged what sounded like an orderly effort to surrender.  He alleged that he had stopped his vehicle and put his hands above his head before he was shot.  See Compl. ¶¶32, 34.  Captain Denny testified that he saw plaintiff raise his hands *after* the vehicle had stopped and *after* the gunfire ended.  Denny Aff. ¶ 29.  As Rule 56(e)(2) makes clear, a party opposing summary judgment may not "rely merely on allegations or denials in [his] own pleading" to show the existence of a genuine issue of material fact.   The court and the defendants are entitled "to demand at least one sworn averment of [a material] fact before the lengthy process of litigation continues."   *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).  Marion has not been willing or able to provide any *evidence* that he had stopped the vehicle and put his hands above his head to surrender before the officers fired.

Officer Sadler fired his rifle at the Explorer as it first passed him while he was standing at mile marker 105 and then four times from his vehicle as Marion later tried to pass him on the shoulder.  Sadler testified that he aimed all of those shots at the engine compartment in an effort to disable the vehicle.

After Marion stopped revving the engine and the shooting stopped, he was pulled from the vehicle and was given medical attention.  As a result of his wounds, Marion lost his right eye and suffered severe damage to his left hand.  Though he was not actually armed, none of the law enforcement officers on the scene were aware of that fact when they fired their weapons.  Those who have submitted sworn affidavits have all stated that they believed Marion was armed, based on radio transmissions and, in some instances, from the manner in which he was reaching around in his vehicle while driving, as though possibly attempting to locate a firearm.  The undisputed facts show that the officers reasonably believed that Marion was actually or probably armed.

*Discussion*

I.     *The Reasonableness of the Lethal Force*

Marion's sole claim in this lawsuit is that the defendants used excessive force to arrest or seize him.  Courts use the Fourth Amendment, which prohibits unreasonable seizures, to analyze claims that law enforcement used excessive force in the course of taking a person into custody.  *Graham v. Connor*, 490 U.S. 386, 394-95 (1989), citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985).  Whether the force used to effect an arrest or seizure is excessive depends on the totality of circumstances under an objective reasonableness standard:  "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397.

In examining the totality of circumstances, the court must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396.  In a lesson that has special poignancy in a case like this one, the Supreme Court has also taught that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense,

uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

The Fourth Amendment reasonableness test is not amenable to a precise definition, but the Supreme Court has taught that it is reasonable for a law enforcement officer to use deadly force if an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others. *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). The Seventh Circuit has found the use of lethal force was objectively reasonable as a matter of law where it was clear that an officer used his firearm in self-defense, *Plaskas v. Drinski*, 19 F.3d 1143, 1146-47 (7th Cir. 1994) (affirming summary judgment for defendants), or in an attempt to stop the suspect from injuring other officers, *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) (affirming summary judgment for defendants). The Seventh Circuit also affirmed summary judgment when an officer shot and killed a suspect who, after stealing a car and nearly running over the officer, was driving erratically at high speed through a parking lot, threatening the safety of people in the immediate vicinity. *Scott v. Edinburg*, 346 F.3d 752, 758-59 (7th Cir. 2003).

There is no seizure within the meaning of the Fourth Amendment unless either an officer uses direct physical force or the subject submits to the officer's assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991); accord, *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (observing that no

seizure would occur during police chase where suspect continued to flee, failed to submit to authority, lost control, and crashed into barrier set up by police); accord, *Graham v. Connor*, 490 U.S. at 395 n.10, quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

The affidavits and video and audio evidence here show beyond dispute that at no time during his flight from the Kroger store and the highway chase did Marion acquiesce or submit to police powers until he was shot and immobilized while in the median of the interstate highway. The chase itself, the use of the stop sticks, and even the shots that Officer Sadler fired at Marion's moving vehicle without effect therefore did not amount to seizures under the Fourth Amendment. See *Cole v. Bone*, 993 F.2d 1328, 1331-33 (8th Cir. 1993) (reversing denial of summary judgment for defendants; roadblocks and shots fired by police in unsuccessful attempts to disable vehicle during rolling roadblock were not seizures; no seizure occurred until driver was actually shot and chase ended); accord, *Carter v. Buscher*, 973 F.2d 1328, 1332-33 (7th Cir. 1992) (affirming summary judgment for defendants and holding that no seizure occurred until shot actually struck the suspect).

Turning to the actual seizure, the gunfire at Marion in the median of Interstate 64, Marion's attorneys argue that the officers who fired their weapons after he seemed to get stuck in the median had no reason to believe he was an immediate threat to them or to others. His attorneys also contend that those

officers who did not fire their weapons should have intervened to prevent the other officers from firing. The defendants all contend that the undisputed evidence demonstrates that when the shots were fired, they had reasonable grounds to believe Marion was still endangering the officers and the public by trying to drive across the median and onto the eastbound lanes of the highway. They contend they all acted reasonably by using lethal force to end his efforts.

The court concludes that the undisputed facts show it was reasonable for the officers to fire their weapons as Marion was still revving the engine, moving the Explorer, and trying to gain traction to continue his flight, especially when officers stood in or near the paths of possible escape with the vehicle. The defense affidavits and unchallenged video evidence from the police vehicles allow this court to reach its conclusion with confidence. See *Scott v. Harris*, 550 U.S. —, —, 127 S. Ct. 1769, 1776 (2007). The court should not be understood as endorsing a broad rule that police officers are entitled to fire their weapons at a fleeing driver under any and all circumstances. Cf. *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003) (reversing grant of summary judgment based on qualified immunity for officer who fired at fleeing truck, striking and paralyzing passenger; under plaintiff's version of evidence, truck was moving at high speed but road was clear of traffic and truck had not aggressively threatened officer; no evidence of earlier, less dangerous efforts to stop truck).[6] In this case, however, by the time the chase

---

[6]One district court has concluded that *Vaughan* is no longer good law on this point, in light of *Scott v. Harris*. See *Sharp v. Fisher*, 2007 WL 2177123, at *7 (continued...)

of Marion reached the highway median, the objective circumstances the officers were facing, shown by undisputed evidence, weighed heavily in favor of allowing lethal force with respect to all three of the principal factors under *Graham v. Connor*.

Those factors – severity of the crime at issue, immediate threat to safety of officers or others, and active attempts to evade arrest by flight – all blended together in this case.  What had started out as a shoplifting case in Louisville, as plaintiff repeatedly points out, had become a much more serious and dangerous matter by the time Marion turned into the median.  For more than thirty minutes and over twenty miles of public streets and highways, Marion had attempted to escape arrest.  He had assaulted officers in Louisville.  In the high speed chase that he had started and prolonged, he had taken repeated actions that threatened the safety of the public and law enforcement officers.  Repeated, less dangerous means to stop Marion's flight – the lights and sirens themselves, the stop-sticks, the rolling roadblock, and even shots at the vehicle – had been unsuccessful.  The Indiana officers had been informed, rightly or wrongly, that the suspect was armed.  Marion then drove into a highway median, became stuck for a moment, and then attempted to regain traction and drive toward police officers who had surrounded his vehicle and toward the eastbound lanes of the highway.  Other civilians were present there, and it was not beyond reasonable possibility, from

_____

[6](...continued)
n.2 (S.D. Ga. July 26, 2007).

the officers' perspective, that the suspect they believed was armed could have commandeered an undamaged vehicle from among those nearby and continued his flight.[7]

Under the circumstances shown by undisputed evidence, it was reasonable, as a matter of law, for the officers to fire weapons to stop Marion from running them down and/or continuing his attempted escape into the eastbound lanes of traffic.   On this record, the Supreme Court's teaching from *Scott v. Harris* is directly applicable:   "A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."  550 U.S. at —, 127 S. Ct. at 1779.

The court recognizes that the Supreme Court in *Scott* was addressing not an officer's use of his weapon but his use of a police vehicle to try to cause the

---

[7]The record of dangerous and reckless behavior in a high speed chase here is even stronger than the evidence summarized by the Supreme Court in *Scott*:

> It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that [Officer] Scott confronted.   Multiple police cars, with blue lights flashing and sirens blaring, had been chasing respondent for nearly 10 miles, but he ignored their warning to stop.  By contrast, those who might have been harmed had Scott not taken the action he did were entirely innocent. We have little difficulty in concluding it was reasonable for Scott to take the action that he did.

550 U.S. at —, 127 S. Ct. at 1778.  The fact that Marion survived and no others were injured is fortunate and not to be taken for granted.

fleeing car to lose control.  See 550 U.S. at —, 127 S. Ct. at 1778 (distinguishing between "high likelihood of serious injury or death" and the "near certainty of death posed by, say, shooting a fleeing felon in the back of the head" or "pulling alongside a fleeing motorist's car and shooting the motorist").  This case, however, fits the dicta in *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985):  "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."[8]

Summary judgment in favor of the defendants is consistent with decisions from a number of factually analogous cases.  For example, in *Troupe v. Sarasota County*, 419 F.3d 1160, 1168-69 (11th Cir. 2005), the court affirmed summary judgment for officers who fired at a suspect in his car, finding there was no constitutional violation.  The suspect was wanted on an arrest warrant for a drug felony, was out on bond for a murder charge, and was known to be violent and to have run from police before.  The officers surrounded the suspect's car with their weapons drawn and shouted orders to get out of the vehicle.  The suspect disobeyed orders to put his hands up.  The car then suddenly moved forward and

---

[8]On the warning question, the undisputed facts show that shots had been fired earlier at Marion's vehicle.  They did not persuade him to stop.  As the officers approached his vehicle in the median, they had their weapons drawn and aimed.  Marion continued his efforts to flee, which further endangered the officers.

backward, apparently endangering the officers.  The Eleventh Circuit held that it was reasonable as a matter of law for an officer to fire at the driver at that point.

In *Scott v. Clay County*, 205 F.3d 867 (6th Cir. 2000), a chase began when a suspect ran a stop sign and made a reckless turn.  The driver accelerated, forced at least one other car off the road, and sometimes crossed the yellow line into lanes for oncoming traffic.  *Id.* at 871-72.  After about twenty minutes of a high speed chase, the driver lost control of his car and came to a stop against a guard rail.  As the officer approached the stopped car on foot, the driver accelerated quickly, forcing one officer to leap out of the way.  The car then turned back toward the highway, and another officer then fired, severely wounding a passenger in the car.  *Id.* at 872-73.  The Sixth Circuit, over a dissent by Judge Clay, reversed the denial of summary judgment and found that the force was constitutionally reasonable.  *Id.* at 877-78.

In *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992), the chase began when an officer saw a car race out of an apartment complex and run a stop sign.  The chase exceeded 90 miles per hour and at least one threatening swerve toward the police car.  One roadblock failed, but eventually the suspect seemed to be cornered in a dead-end street.  The officer got out of his car and moved toward the suspect to remove him from his car.  The suspect suddenly backed up his car, sped forward, crashed in to the police car pinning his car in, then backed up and sped around the police car.  As it passed the officer on foot, the officer fired one

shot, killing the driver.  *Id.* at 344.  The suspect's mother sued the officers, arguing among other things that the shooting officer was no longer in danger himself when he fired and that other officers had formed another roadblock at the entrance to the dead-end and would have prevented any further escape.  The Sixth Circuit affirmed summary judgment and held that the shooting was reasonable as a matter of law.  *Id.* at 346-47.

In *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991), the Fifth Circuit rejected the idea that a surrounded suspect no longer presents a danger to others. The shooting in *Reese* occurred after a high-speed chase in which apparently stolen objects had been thrown from the car.  The car came to a sudden stop, and police officers surrounded it.  At least one officer was pointing his gun at the driver and passengers.  They initially complied with his orders, but one then "repeatedly reached down in defiance" of the officer's orders, reaching below his sight line.  *Id.* at 500.  The officer fired, striking the driver in the head and killing him.  The driver turned out not to have been armed.  *Id.* at 497.  The Fifth Circuit reversed denial of summary judgment for the officer, holding that the officer reasonably feared that he and other officers were in imminent danger from a suspect who appeared to be reaching for what could have been a weapon.  *Id.* at 500-01.[9]

_____

[9]One unusual parallel between *Reese* and this case is the complete absence of evidence from the plaintiffs in both cases in opposition to summary judgment. Writing for the Fifth Circuit, Judge Goldberg emphasized the compete absence of evidence from the plaintiff, despite a detailed complaint and three surviving
(continued...)

II.     *The City of Corydon and Officers Sadler and Stinson*

The court turns to examine the undisputed facts as they apply to each group of defendants currently seeking summary judgment.  Officers James Sadler and Gary Todd Stinson were the two Corydon police officers who participated in the chase leading to plaintiff's arrest.   Both Sadler and Stinson fired their weapons.  Sadler fired his rifle once at the engine compartment of the Explorer as Marion evaded stop sticks near mile marker 105 and rolled past Sadler's position on the side of the interstate.  After joining the chase and serving as the lead car in the rolling road block that was employed a couple of miles down the road, Sadler fired four more shots from his rifle at Marion's vehicle as it swung to the left of him and Marion drove it on the shoulder while attempting to pass or hit Sadler's vehicle.  When Marion then drove down into the median, Sadler stopped his vehicle and exited to stand to the west of Marion's vehicle with his rifle aimed at the vehicle.  After others began firing as Marion drove his vehicle toward the officers in front of his vehicle, Sadler fired several more rounds at Marion's vehicle. Officer Stinson, who by that time had exited his vehicle and was behind Marion's Explorer, fired several shots at the one rear tire that remained inflated.

Marion argues first that Sadler violated Corydon police rules and regulations that prohibit gunfire at moving vehicles except as an ultimate measure

---

[9](...continued)
passengers in the car.  926 F.2d at 499 ("At the summary judgment stage, we require *evidence* – not absolute proof, but not mere allegations either.").

of self-defense or in defense of others.  While it is easy to argue that Sadler's shots at the moving vehicle on the highway were in defense of himself and other officers endangered by Marion's continued dangerous driving as he tried to flee, the issue is moot for two reasons.  First, 42 U.S.C. § 1983 does not provide a right of action for violations of department policies.  The plaintiff must prove a violation of federal constitutional rights.  See *Smith v. Freland*, 954 F.2d at 347-48 (finding that officer's violation of police force policies did not show he violated Fourth Amendment in shooting and killing a suspect).  Second, as indicated previously, Marion did not submit to these earlier efforts to stop and seize him, so they did not amount to seizures under the Fourth Amendment.  See *California v. Hodari D.*, 499 U.S. at 626-27.

The Corydon officers seized Marion when his vehicle was in the median and Sadler fired his last shots and Stinson fired at the Explorer's tires.  The undisputed facts show that Marion then posed an immediate threat to the safety of the officers on the scene and civilians on the highway nearby.  Despite counsel's arguments that plaintiff was unarmed and that his vehicle was nearly certain to remain stuck in the mud, the affidavits and the audio and video recordings clearly show that Marion was continuing his efforts to move his vehicle across the median by revving the engine and shifting from forward to reverse to forward again.  See App. K from 16:20:50 to 16:21:20.  The objective indications were that Marion did not care that officers were in his path.  There is no evidence that he ceased his attempt to flee until he was struck by gunfire.

The use of lethal force by the officers surrounding Marion's vehicle was reasonable under the circumstances, as a matter of law. While Marion may have committed only a misdemeanor when he attempted to shoplift at the grocery store, he became a fleeing and dangerous felon when he refused to be taken into custody, assaulted the Louisville officers, and led law enforcement on the high speed chase. His reckless driving during the course of the chase – evident beyond dispute to anyone who watches the videos – endangered the officers and the public using the highway. He attempted or threatened to ram police vehicles during the rolling roadblock. He endangered other officers when he swerved to miss stop sticks. Based on the information they received by radio, all of the Indiana law enforcement officers had good reason to assume that Marion was armed. He had been using his vehicle as a dangerous weapon and then a deadly weapon for miles by the time the chase came to an end. Although his vehicle was seriously damaged, he was continuing to use it dangerously until the gunfire disabled him. Nothing in his behavior gave the officers reason to believe he was ever willing to stop fleeing. To the officers nearby, the objective indications were that Marion intended to escape from the median, regardless of whether he had to run over anything or anyone. See *Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003) (observing that vehicle can be operated as a deadly weapon).

Since there is no respondeat superior liability in § 1983 cases, the City of Corydon could be liable only if one or more of its officers actually violated Marion's constitutional rights and the violations were caused by a city custom or policy.

See *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694-95 (1978); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006). Plaintiff suggests that he needs more discovery regarding Corydon's policies and practices to satisfy the *Monell* standard.  Because the undisputed facts show, however, that no Corydon officer violated plaintiff's constitutional rights, the city cannot be liable to plaintiff.  See *Jenkins v. Bartlett,* 487 F.3d 482, 492 (7th Cir. 2007).  There would be no point in further discovery directed at Corydon's policies and practices.  Corydon and its officers are entitled to summary judgment.

III.    *Harrison County and Officers Wiseman, Lahue, and Taylor*

Defendants Roy Wiseman, Bruce Lahue, and Kevin Taylor are all officers with the Harrison County Sheriff's Department.   Armed with a shotgun, Commander Bruce Lahue fired only one shot.  He shot at the remaining inflated rear tire on Marion's vehicle after it entered the median and as Marion continued to try to gain traction by revving his engine.  Deputy Kevin Taylor also fired at the vehicle while in the median.   Lieutenant Roy Wiseman had driven his vehicle through the median and near the eastbound lanes to try to cut off Marion's possible escape route.  When he left his vehicle, Wiseman approached Marion's Explorer from the front.  In fear for his own safety, Wiseman fired at the vehicle's radiator eight or nine times in an effort to disable it, as it began to lurch forward in the median with the engine revving.  Michael Kurz, another Harrison County Deputy, was also tailing Marion and on the scene at the time of the barrage of

shots.  There is no evidence that he fired his weapon.  He testified, as did civilians who witnessed the events from the highway, that at no time did Marion give any sign of surrender.

As with the Corydon officers, no Harrison County officer violated Marion's constitutional rights by firing their weapons.  The undisputed facts show that Marion gave no signs that he was going to surrender and that he posed an immediate threat to the officers and general public in the eastbound lanes of the interstate highway.  Neither these officers nor Harrison County can be held liable under 42 U.S.C. § 1983.[10]

IV.    *City of New Albany and Its Officers*

New Albany Police Captain Rick Denny was the first law enforcement officer from Indiana to join the chase when Marion arrived in Indiana.  The complaint alleges liability on the part of an unknown number of "John Doe" officers from New Albany, but Captain Denny is the only one who has been identified as participating in the chase and arrest.  Captain Denny drove the lead chase vehicle for most of the more than seventeen miles of Indiana interstate that Marion

---

[10]The motion for summary judgment filed by the individual Harrison County defendants does not specifically state that defendant Harrison County also seeks summary judgment in its favor.  Plaintiff's response brief addresses the motion as though it were filed on behalf of the county as well as its officers, and that is how the court treats the motion.  As explained above, the undisputed facts show that no Harrison County officer violated Marion's constitutional rights, so there also is no basis for holding the county liable.

traveled in his attempt to escape.  The video from Denny's police cruiser tells much of the undisputed story of that chase, including a view of Marion reaching across the front of his vehicle as though attempting to hide or grab something on the passenger side.  The undisputed evidence shows that Captain Denny never fired a shot.  He could be liable only if he failed to take reasonable steps to intervene to stop other officers from violating Marion's constitutional rights.

Captain Denny testified in an affidavit that although he did not observe Marion with a weapon and was not certain that he was armed, the description he received from dispatch when he first learned of Marion's approach on the interstate was that he was an armed robbery suspect.  Marion's actions in the front seat during the chase reinforced the likelihood that he had a weapon and Denny presumed that he did.  Captain Denny confirmed that Marion was driving at speeds in excess of 80 miles per hour before he hit the first set of stop sticks.

Plaintiff contends that Captain Denny caused a violation of his Fourth Amendment rights by failing to prevent other officers from using excessive force. In general, police officers who are present and fail to intervene to prevent other law enforcement officers from violating a person's constitutional rights can be found liable under § 1983 for causing the violation.  See, *e.g.*, *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005).  This claim fails because no other officers violated Marion's constitutional rights.  Even if there were some question on that score, the undisputed evidence shows that Denny could not reasonably

be expected to have acted to stop the shooters.  To be liable under § 1983 for failing to intervene, there must have been an opportunity for the officer to take some type of preemptive action.  See *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988); *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981).  No reasonable person watching the video recordings of the end of the chase could conclude that Captain Denny had a reasonable opportunity to stop the shots fired in quick succession at Marion's vehicle.

At the conclusion of the chase, when Marion drove down into the median, Denny pulled his car to a stop at the side of the road because he believed Marion would become stuck in the muddy median.  Captain Denny left his vehicle and along with other officers quickly began to approach Marion's nearly idle vehicle from the rear.  Suddenly Marion put his Explorer in reverse and gunned the motor, slinging mud and moving back several feet before he shifted into a forward gear and began to gain some traction toward the opposite side of the interstate and the officers who were approaching from the front.  Denny testified that an officer was positioned almost directly in front of Marion's vehicle as it attempted to cross the median into the eastbound lanes of the interstate.  Near the moment when Marion shifted into a forward gear, Captain Denny heard shots fired, but he is unsure who fired them or at what target.  Because Marion's vehicle was continuing forward and a cross-fire danger existed, Denny backed away several paces.  As he did so he heard a series of gunshots that ended when the Explorer's engine stopped revving.  No reasonable jury could find that Captain Denny could

reasonably have stopped any of the shooting that occurred in that final series of shots in the median.

Since there is no respondeat superior liability in § 1983 cases, the City of New Albany could be liable only if a New Albany police officer violated Marion's constitutional rights and the violations were caused by a city custom or policy. Plaintiff argues that discovery has not been completed with respect to New Albany's policies and customs. Because there is no evidence that any New Albany officer violated Marion's constitutional rights, there can be no municipal liability. *Jenkins v. Bartlett,* 487 F.3d 482, 492 (7th Cir. 2007). Further discovery would not change that result. New Albany and its officers are entitled to summary judgment.

V.   *Plaintiff's Motion to Amend the Complaint*

Plaintiff has also moved to amend his complaint to add two individual officers as named defendants, Captain Rick Denny from the New Albany police and Trooper Laura Hess from the Indiana State Police. Rule 15(a)(2) of the Federal Rules of Civil Procedure states that the court should grant leave to amend freely "when justice so requires." Here justice does not require an amendment. As discussed in this entry, the undisputed facts show that Captain Denny did not fire his weapon and had no opportunity to stop others from firing their weapons, though he would not have been required to do so anyway, since the use of lethal

force by officers was reasonable under the circumstances.  The proposed amended complaint asserts that Trooper Hess also had an obligation to intervene to stop other officers from firing their weapons.  Again, the undisputed facts show that there was no constitutional violation, and there is no indication that Trooper Hess would have been able to take any action to intervene even if there had been a violation.

When a proposed amendment to a complaint is futile or late, the trial court is not required to allow amendment.  *Bethany Pharmacal Co. v. QVC, Inc.,* 241 F.3d 854, 861 (7th Cir. 2001).  "An amendment is futile if the added claim would not survive a motion for summary judgment."  *Id.*  That is the case here.  Where the court has previously given a deadline for amending the pleadings and a party waits past that deadline to seek amendment despite having identified the new named defendants before that deadline, the court need not allow an amendment. *Hindo v. University of Health Sciences/Chicago Medical School,* 65 F.3d 608. 614-15 (7th Cir. 1995).  Plaintiff's motion to amend the complaint is denied.

*Conclusion*

Plaintiff Trent Marion suffered serious injuries when several of the defendant police officers fired their weapons to prevent him from fleeing further. The undisputed facts show that the officers fired those shots only after Marion had endangered the officers and hundreds of innocent civilians over the course of

a long high-speed chase, and only after less drastic measures had repeatedly failed to stop Marion's attempt to flee.  In the words of the Supreme Court in *Scott v. Harris*, it was Marion "who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight" that ultimately led the officers to fire their weapons.  550 U.S. at —, 127 S. Ct. at 1778.  The summary judgment motions filed on behalf of the City of New Albany, the City of Corydon, Harrison County, the John Doe Officers from those agencies, and Officers Sadler, Stinson, Wiseman, Lahue, and Taylor (Docket Nos.  84, 91, and 96) are granted.  Plaintiff's motion for leave to amend (Docket No. 115) is denied.  Plaintiff's three motions for oral argument on the summary judgment motions (Docket Nos. 101, 106, and 109) are denied.  Finally, plaintiff shall show cause no later than April 17, 2008, why summary judgment should not be granted in favor of all remaining defendants on the grounds stated above, plus the indications in the record that plaintiff never submitted to any use or display of force by any Louisville police officer.  Defendants may respond no later than 28 days after plaintiff files any response to this order.


　　　So ordered.

Date: March 20, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Donald G. Banta
INDIANA STATE ATTORNEY GENERAL
Donald.Banta@atg.in.gov

Dwight Timothy Born
TERRELL BAUGH SALMON & BORN LLP
tborn@tbsblaw.com

William K. Burnham
SHEFFER LAW FIRM LLC
wburnham@kylaw.com

James D. Crum
COOTS HENKE & WHEELER
jcrum@chwlaw.com

Jeffrey L. Freeman
ASSISTANT JEFFERSON COUNTY ATTORNEY
jeff.freeman@louisvilleky.gov

Brandon A. Gibson
COOTS HENKE & WHEELER, P.C.
bgibson@chwlaw.com

Matthew L. Hinkle
COOTS HENKE & WHEELER
mhinkle@chwlaw.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP
jlowe@k-glaw.com

Richard T. Mullineaux
KIGHTLINGER & GRAY, LLP
rmullineaux@k-glaw.com

Patrick J. Renn
prenn@smithhelman.com

Cory Christian Voight
INDIANA STATE ATTORNEY GENERAL
cory.voight@atg.in.gov